David J. McGlothlin, Esq. (SBN 026059)
david@kazlg.com
Ryan L. McBride, Esq. (SBN 032001)
ryan@kazlg.com
Kazerouni Law Group, APC
301 E. Bethany Home Road, Suite C-195
Phoenix, AZ 85012
Phone: 800-400-6808
Fax: 800-520-5523

*Attorneys for Plaintiff*

## UNITED STATES DISTRICT COURT
## DISTRICT OF ARIZONA
## PRESCOTT DIVISION

| | |
|---|---|
| **Sean Sullivan,** individually and on behalf of a class of similarly situated persons,<br><br>       Plaintiff,<br><br>       v.<br><br>**West Side Lending, LLC, Wolf River Development Company, New Platform Fund, LLC, North American Banking Company, Viking Client Services, LLC, and Red Cypress Group, doing business as Valley Servicing,**<br><br>       Defendants. | Case No.:<br><br>**CLASS ACTION COMPLAINT FOR DAMAGES**<br><br><br><br>**JURY TRIAL DEMANDED** |

COMES NOW the Plaintiff, **Sean Sullivan** ("**Mr. Sullivan**"), on behalf of himself and all similarly situated individuals, by and through his attorneys, Seraph Legal, P.A., and complains of the Defendants, **West Side Lending, LLC** ("**West Side Lending**"), **Wolf River Development Company** ("**Wolf River**"), **New Platform Fund, LLC** ("**New Platform**"), **North American Banking Company** ("**NABC**"), **Viking Client Services, LLC,** *doing business as* **Viking Billing Services** ("**Viking**"), and **Red Cypress Group**, *doing business as* **Valley Servicing** (collectively, the "**Defendants**"), stating as follows:

**DESCRIPTION OF THE CASE**

1.     This is an action against the Defendants for violations of the *Racketeer Influenced and Corrupt Organizations Act*, 18 U.S.C. § 1961, *et seq.* ("**RICO**") and for unjust enrichment, and against Red Cypress Group, only, for violations of the *Fair Debt Collection Practices Act*, 15 U.S.C. § 1692, *et seq.* ("**FDCPA**").

2.     The Defendants are part of an illegal lending enterprise that seeks to avoid state usury laws through a "Rent-A-Tribe" model.

3.     West Side Lending is one of multiple high-interest lending entities purportedly owned by the Menominee Tribe of Wisconsin (the "**Menominee Tribe**"), a federally-recognized Native American Tribe. Others include Moose

Lending, LLC, Elk Lending, LLC, Fox Lending, LLC d/b/a Loop Fund, and East Line Lending, LLC. All of these entities are operated by Wolf River through two subsidiaries, Four Directions Lending, LLC, and Five Clans Lending, LLC.

4.    West Side Lending does business in Arizona over the Internet, via text message, via *Automated Clearing House* ("**ACH**") transactions, and over the telephone.

5.    West Side Lending charges interest exceeding 700% annually – rates which are illegal in most states, including Arizona.

6.    Indeed, Arizona law caps interest rates at 36% annually for licensed consumer lenders. Ariz. Rev. Stat. § 6-632.

7.    Loans made at interest rates higher than allowed are voidable and the lender has no right to collect or receive any principal, finance charges, or other fees. Ariz. Rev. Stat. § 6-613.

8.    West Side Lending is not licensed to conduct business in the State of Arizona.

9.    Pursuant to Arizona law, any consumer loan made by an unlicensed lender is void, and there is no right to collect, receive or retain any principal, finance charges, or other fees in connection with that loan. Ariz. Rev. Stat. § 6-613(B).

10.    While many of the loans issued through West Side Lending are collected by the lender, through its related entities, certain delinquent debts are

assigned to Red Cypress Group, which collects debts using the names "Apex Servicing" and "Valley Servicing."

11.     A primary method Red Cypress Group uses when attempting to collect usurious loans is to send *wage assignment* letters to the consumer's employer; such notices are designed to appear to be official wage garnishment notices sent by a court of law, claiming that the employer is required to garnish the consumer's wages and remit payment to Apex Servicing or Valley Servicing for repayment of the consumer's loan.

12.     Despite their appearance, these are not official or court-issued wage garnishment notices.

13.     Nonetheless, these notices frequently result in employers withholding money from the consumer's paycheck as payment for debts that were unlawful upon origination, and forwarding those funds to Apex Servicing and Valley Servicing.

14.     When said employers forward consumers' wages as instructed, Red Cypress Group retains a percentage of the funds as their fee or commission.

**JURISDICTION AND VENUE**

15.     Subject matter jurisdiction for Plaintiff's federal claims arises under the FDCPA, 15 U.S.C. § 1692k(d), RICO, 18 U.S.C. § 1965, and 28 U.S.C. § 1331.

16.    This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367.

17.    This Court may also exercise diversity jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. § 1332(d)(2) as the matter in controversy exceeds $5,000,000 and a member of a class of the plaintiffs is a citizen of a different state from one or more of the defendants.

18.    Venue is proper in the District of Arizona, pursuant to 28 U.S.C. § 1391(b), because the events giving rise to this cause of action occurred within Arizona, including in this District and Division.

**PARTIES**

**Mr. Sullivan**

19.    **Mr. Sullivan** is a natural person residing in Kingman, Mohave County, Arizona, and a *Consumer* as defined by the FDCPA, 15 U.S.C. § 1692a(3).

**West Side Lending and Related Entities**

20.    **West Side Lending** is an online lender that offers loans to consumers at annual percentage rates between 630% and 780%. It purports to be an entity formed under the laws of, and claims to be controlled by, the Menominee Tribe of Wisconsin, a federally-recognized Tribe.

21.    West Side Lending conducts business using the address P.O. Box 687, Keshena, WI 54135.

22.    West Side Lending likewise conducts business using the address W2818 Warrington Road, Keshena, WI 54135.

23.    **Wolf River** is an entity located at W2908 Tribal Office Loop, Keshena, WI 54135.

24.    **New Platform** is an entity which uses the addresses W2818 Warrington Road, Keshena, WI 54135 and P.O. Box 1017, Keshena, WI 54135.

25.    New Platform holds a security interest in all assets of West Side Lending.

## NABC

26.    **NABC**, at all times relevant, processes *Automated Clearing House* ("**ACH**") payment transactions for Credit Cube.

27.    NABC's principal business address is 2230 Albert St. N, Roseville, MN 55113.

## Viking

28.    Viking Billing Services, also referred to as Viking Payment Service, is a subdivision of Viking Client Services, LLC, and at all times relevant, processes *Automated Clearing House* ("**ACH**") payment transactions for West Side Lending.

29.     Viking's primary business address is 10050 Crosstown Cir., Suite 300, Eden Prairie, MN 55344.

30.     Viking is registered to conduct business in the State of Arizona, where its registered agent is Business Filings Incorporated, 3800 N. Central Ave., #460, Phoenix, AZ 85012.

**Red Cypress Group**

31.     **Red Cypress Group** is an entity of unknown designation.

32.     Red Cypress Group conducts business at 333 South Main St., Blanding UT 84511.

33.     Upon information and belief, Red Cypress Group conducts business using the fictitious names Apex Servicing and Valley Servicing.

34.     Alternatively, Apex Servicing and Valley Servicing are distinct legal entities from Red Cypress Group, and Red Cypress Group holds an ownership interest in both Apex Servicing and Valley Servicing. Should discovery reveal that Apex Servicing and Valley Servicing are distinct entities, Plaintiff will seek leave to amend the Complaint to name Valley Servicing as a defendant.

35.     According to its website, Valley Servicing is a subsidiary of the Wakpamni Lake Community Corporation ("**WLCC**"), a corporation which claims to act as an arm of the Oglala Sioux Tribe of the Pine Ridge Indian Reservation.[1]

36.     Red Cypress Group is a *Debt Collector* as defined by the FDCPA, as it uses instrumentalities of interstate commerce, including the postal mail, for its business, the principal purpose of which is the collection of debts, and/or it regularly collects or attempts to collect, directly or indirectly, debts owed or due or asserted to be owed or due another.

37.     Red Cypress Group is not licensed to conduct business in Arizona, which is required in order to engage in the business of a debt management company. *See* Ariz. Rev. Stat. §§ 6-703, 6-715.

**FACTUAL ALLEGATIONS**

38.     On or about March 24, 2022, West Side Lending issued a loan to Mr. Sullivan in the principal amount of $1,500 (the "**Loan**").

---

[1] This claim has been disputed by other members of the Oglala Sioux, such as Arlene Catches the Enemy, the Development Manager at the Oglala Sioux Tribe Office of Economic Development, in various interviews given to news media. Nicholas Nehamas, *The Tribe That Said No: How One Rogue Tribal Member Tried To Drag The Oglala Sioux Into Payday Lending*, Al Jazeera America, June 18, 2014, http://projects.aljazeera.com/2014/payday-nation/sioux-tribe-payday.html.

39.     West Side Lending charged an interest rate of 777.85% annually on the Loan, requiring Mr. Sullivan to repay a total of $11,472.93. **SEE PLAINTIFF'S EXHIBIT A.**

40.     On or about March 24, 2022, West Side Lending, via Viking, transferred the proceeds of the Loan through the ACH network into Ms. Sullivan's checking account which he maintained in Kingman, Arizona.

41.     The ACH memo line for the transaction stated "VBS West Side."

42.     Upon information and belief, "VBS" is shorthand for Viking Billing Services and indicates that Viking was the entity originating the ACH transaction.

43.     A week after the effective date of the Loan, West Side Lending, via Viking, began initiating bi-weekly ACH withdrawals from Mr. Sullivan's checking account.

44.     The ACH memo line for the withdrawal transactions also stated "VBS West Side," with the "VBS" again indicating the transaction was initiated by Viking.

45.     Mr. Sullivan repaid at least $2,129.59.

46.     Despite repaying $2,129.59 on a loan of $1,500, West Side Lending claimed Mr. Sullivan owed $3,415.24 *more* (the "**Debt**").

47.     Because the Loan was subject to an annual interest rate which vastly exceeded the 36% limit as proscribed in § 6-632, Ariz. Rev. Stat., the Debt was void *ab initio* and unenforceable pursuant to § 6-613, Ariz. Rev. Stat.

48.     West Side Lending also lacked a Consumer Lender license in Arizona, rendering the Loan void under Ariz. Rev. Stat. § 6-613(B).

49.     Due to the Loan's 700%-plus interest rate and the lack of a license, West Side Lending had no right to collect or receive any principal, finance charges, or other fees. Ariz. Rev. Stat. § 6-613.

50.     The Debt therefore constitutes an *Unlawful Debt* as defined by 18 U.S.C. § 1961(6).

51.     Mr. Sullivan utilized the proceeds from the Loan for personal and household expenses, and thus, the Debt thus meets the definition of *Debt* under the FDCPA, 15 U.S.C. § 1692a(5).

52.     At some point prior to December 29, 2022, West Side Lending assigned the Debt to Red Cypress Group and/or Valley Servicing for collection, or Red Cypress Group and/or Valley Servicing were otherwise hired to collect the Debt.

53.     On December 29, 2022, Valley Servicing faxed a ***Wage Assignment Demand Notice*** to Mr. Sullivan's employer, Freedom Auto Sales. **SEE PLAINTIFF'S EXHIBIT B.**

54.    The Wage Assignment Demand Notice was a communication which stated the balance of the Debt – $3,415.24 – and sought payment.

55.    The Wage Assignment Demand Notice was thus in connection with the collection of the Debt and an attempt to collect the Debt.

56.    The Wage Assignment Demand Notice falsely represented that Mr. Sullivan owed $3,415.24 to West Side Lending, when such a balance was unenforceable against Mr. Sullivan.

57.    The Wage Assignment Demand Notice demanded that Freedom Auto Sales withhold 15% of Mr. Sullivan's pay and send it West Side Lending, PO Box 8490, Mesa, AZ 85214.

58.    In sending the Wage Assignment Demand Notice, Valley Servicing falsely represented that it had the legal right to garnish or assign a portion of Mr. Sullivan's wages.

59.    Further, Valley Servicing disclosed derogatory, legally-protected information about Mr. Sullivan's purported Debt to his employer, without Mr. Sullivan's authorization or consent

60.    Mr. Sullivan became extremely upset and emotionally distraught upon learning that his income – already stretched thin – had been reduced in this manner.

61.    As aforementioned, Valley Servicing claims to operate as an arm of the Oglala Sioux Tribe.

62.     However, other than Valley Servicing, and a similar entity, Apex Servicing, every other WLCC-related business operates in Wakpamni Lake, South Dakota, on the Oglala Sioux's reservation.

63.     Until recently, Valley Servicing claimed to operate in the Phoenix, Arizona metro area – more than 1,000 miles from the Oglala Sioux's reservation.

64.     Valley Servicing also listed a Post Office box in Mesa, Arizona, as its mailing address and its website gave 3651 E. Baseline Rd., Suite E-130, Gilbert, AZ 85295 as its physical address.

65.     Public records show the address is registered to Christian Miller Insurance Agency, LLC ("**Miller Insurance**"), an independent agent for State Farm Insurance.

66.     Public records also show that Miller Insurance received a $5,320 Paycheck Protection Program ("**PPP**") loan in May 2020, and listed 3651 E. Baseline Rd., Suite E-130, Gilbert, AZ 85295 as its primary address.

67.     The website of Valley Servicing lists its business hours as "6am-2pm PST," despite Arizona being in the Mountain Time Zone.

68.     Thus, Valley Servicing has gone to great lengths to conceal its true identity and location.

69.     Assuming the WLCC is aware of its name and logo being used in connection with Red Cypress Group and Valley Servicing, the businesses do not

operate as legitimate arms of the Oglala Sioux Tribe as they: (a) are not located on tribal land and in fact are located in other states; (b) do not in any way promote the economic interests of the Oglala Sioux Tribe; and, (3) operate primarily – and, possibly, *exclusively* – for the benefit of non-tribal individuals.

70.     Likewise, whatever their provenance, Red Cypress Group and Valley Servicing are "debt collectors" under the FDCPA since they receive debts for collection already in default and then attempt to collect those debts on behalf of the original creditors.

**Rent-a-Tribe Schemes**

71.     As aforementioned, West Side Lending is purportedly owned by the Menominee Tribe.

72.     In reality, the Menominee Tribe has virtually nothing to do with the operation of the lending business and simply participates in what is often referred to as a "rent-a-tribe" scheme.

73.     In such a scheme, non-tribal payday lenders attempt to circumvent state usury laws by invoking the sovereign immunity available to Native American tribes.

74.     While the non-tribal entities operate all substantive aspects of the business such as funding, marketing, loan origination, underwriting, loan servicing, electronic funds transfers, and collections for the high-interest loans, the tribe acts

as a label or figurehead in exchange for what is often a relatively insignificant portion of the revenue generated.

75.     However, sovereign immunity does not turn an otherwise illegal loan into a legal one; at best, it potentially creates a defense to criminal or civil prosecution of the crime. *See, e.g., United States v. Neff*, No. 18-2282 (3d Cir. Sep. 6, 2019) (upholding criminal convictions of two individuals engaged in an online payday lending rent-a-tribe scheme; "reasonable people would know that collecting unlawful debt is unlawful").

76.     On information and belief, the Menominee Tribe receives somewhere between one and two percent of loan revenues in exchange for claiming to own the tribal lending entity and, more importantly, providing a veil of sovereign immunity.

77.     On information and belief, the non-tribal entities who truly operate West Side Lending receive a portion of any funds received from collections by Red Cypress Group and Valley Servicing.

78.     Accordingly, Red Cypress Group and Valley Servicing collected on their behalf.

79.     The Oglala Sioux Tribe only retains a small fraction of the income generated by Red Cypress Group and Valley Servicing, with the majority of the proceeds going to benefit the non-tribal service providers for the tribal lending entities.

**Role of Viking and NABC in the Enterprise**

80.  Viking's website states that "Viking Payments is a Registered ISO of North American Banking Company - Roseville, MN." *See* https://vikingpayments.com/, last accessed May 16, 2023.

81.  An "ISO" is an Independent Sales Organization, meaning it is a non-bank, third-party organization which has a relationship with an ***Originating Depository Financial Institution*** ("**ODFI**") such as NABC and re-sells access to that bank's access to the ACH network (and payment associations like Visa and Mastercard); the term Merchant Service Provider ("MSP") is sometimes used interchangeably.

82.  Because ISOs add fees or mark-ups to the cost of each transaction processed, virtually all merchants in traditional industries obtain payment processing services directly through an ODFI, and not through a third-party ISO like Viking.

83.  However, for businesses deemed "high risk," ISOs like Viking are one of very few options to gain access to ACH and debit card processing networks.

84.  Federal regulatory action against ISOs is not unusual when ISOs facilitate payment processing for unlawful or fraudulent entities. *See, e.g., In the Matter of Electronic Payment Systems, LLC* et. al, Agreement Containing Consent Order, file 1523213, Federal Trade Commission, March 15, 2022 (ISO agreed to

terminate operations due to systemic processing of payments for fraudulent companies); *Federal Trade Commission v. Qualpay Inc.*, case 6:20-cv-00945, M.D. Fla, June 1, 2020 ($46.8 million judgment obtained against ISO who processed payments for entities selling fraudulent "start your own business" schemes to consumers); *Federal Trade Commission v. First Data Merchant Services LLC.*, case 1:20-cv-03867, S.D. NY, May 19, 2020 ($40.2 million settlement by ISO which processed payments for fraudulent "debt relief" schemes).

85.   Viking is an ISO with a particular niche in providing ACH, debit card, and credit card payment processing services to the "tribal" online lending industry – an industry considered one of the highest of "high risk" categories as collecting interest on loans made at 700% and higher interest rates is unlawful in almost every state.

86.   In 2013, the United States Department of Justice ("**DOJ**") initiated Operation Choke Point and investigated a large number of banks that processed ACH transactions for payday lenders, as well as other companies believed to be at a high risk for fraud and money laundering.

87.   In March 2015, the DOJ announced a civil and criminal settlement with CommerceWest Bank due to the bank's processing of payday loan fees.

88.     Although Operation Choke Point wound down in August 2017, its effects are still felt today by the online payday lending industry, as virtually every ODFI terminated ACH processing for payday lenders.

89.     Thus, an entire cottage industry exists of ACH payment brokers and middlemen servicing the "tribal" payday lending industry, of which Viking is one of the largest.

90.     Viking operates Viking Client Services, a large, legitimate debt collection agency which collects debts on behalf of many legitimate companies.

91.     Viking Billing Services, which is part of Viking Client Services, also does work for legitimate companies, including reconciliation of damage claims for several major car rental agencies.

92.     As a result of its legitimate operations, Viking produces a large amount of ACH, debit, and credit card processing volume.

93.     Upon information and belief, NABC is the ODFI for these payments.

94.     Viking, as *Viking Billing Services*, spends heavily to promote its services at trade conventions and similar; for example, it was a "Gold Level" sponsor of the Online Lenders Alliance ("**OLA**") 2022 Tribal Lending Conference, held November 1-3, 2022 at an upscale resort in Chandler, Arizona.

95.     According to the OLA, "Gold Level" sponsorship requires at least $20,000 in additional membership dues to be paid.

96.     Viking was also a premium sponsor at a similar industry gathering, the "Tribal Lending Summit" in August 2022.

97.     Viking processes ACH, debit card, and credit card payments for a large number of entities in the online payday lending industry, including Big Picture Loans, River Valley Loans, Oxford Financial Services, Inbox Loans, Better Day Loans, MaxLend, Blue Trust Loans, and many others.

98.     All of the aforementioned lenders claim "tribal" ownership but are actually operated by non-tribal entities as part of rent-a-tribe schemes, and all typically make loans at interest rates exceeding 600% annually.

99.     Viking profits by brokering access to the ACH network, something online payday lenders like West Side Lending need in order to function, yet would be otherwise unavailable to them, as the ramifications from Operation Choke Point have made clear to ODFIs that processing payments for loansharks will likely cost more in fines than the profits it generates.

100.    The ACH network is administrated by the ***National Automated Clearing House Association*** ("**NACHA**"), which implements numerous requirements that participating payment processors must meet.

101.    One such requirement is that ODFIs must gather detailed information about the business operations of their customers to whom they grant access to the ACH network.

102. ODFIs "are the gatekeepers of the ACH Network." *2013 NACHA Operating Rules, Section 2.1 General Rule – ODFI is Responsible for Entries and Rules Compliance (2013 NACHA Operating Rules & Guidelines, Page OR4).*

103. While Viking is one of the larger ISOs catering to the "tribal" payday lending industry, it is certainly not the only such entity.

104. ISOs like Viking often obfuscate – or outright lie – to their ODFI about the end-user's actual business, even though, in some instances, the ODFI is aware of the truth.

105. In the ordinary course of business, small, low-risk businesses typically pay 10 to 15 cents per ACH transaction; larger businesses with processing volumes pay less than a penny per transaction.

106. In contrast, it is not unusual for ISOs like Viking to charge 5% to 15% of the total dollar amount processed, meaning they can profit $50,000 to $150,000 per $1 million processed by their customers.

107. These outsized profits provide strong motivation for transaction brokers to hide their customers' actual business when processors would otherwise refuse service.

108. Upon information and belief, NABC, Viking's ODFI, allows Viking to vet the customers and perform the requisite "due diligence" on Viking's clients itself.

109.   In some scenarios involving "tribal" payday lenders, Viking initiates ACH payments itself on behalf of tribal payday lenders, with its initials, VBS, at the beginning of the ACH memo line.

110.   For example, VBS processes payments for Loan At Last, purportedly owned by a Native American tribe in rural Wisconsin, but, in reality, operated by a California-based non-tribal corporation called CreditServe, Inc. ("CreditServe"), whose owner is Eric Welch ("Welch").

111.   VBS processes the ACH transaction under its own name, presumably coding the transaction as something other than payday lending. The transactions appear on the borrower's bank statement like this:

**Other subtractions**

| Date | Description |
| --- | --- |
| 01/28/21 | VBS Loan At Last DES:8446768550 ID:8479644  INDN:I |

112.   While Viking likely obfuscates or elects not to share data about the true nature of the businesses ran by entities like Creditserve to NABC, Viking knows that non-tribal entities are actually operating these supposedly "tribal" lending enterprises.

113.   Indeed, Viking's website includes a testimonial from Welch, the President and CEO of CreditServe, which operates the purportedly "tribally" owned Loan At Last and River Valley Loans, stating: "The Viking Team works tirelessly ensuring clients are well-serviced and informed, which makes Viking the

most reliable payment processor in the industry. On top of their extended hours and Sunday night ACH processing, they can integrate with any software. The extended hours are not just for processing, but they provide customer service later than other processors. Pure and simple, Viking is easy to use, reliable, and they truly put their clients first."

114.   NABC knows of the illegality of tribal lending operations and that it is participating in the collection of unlawful debts as a result. *See FTC v. Lead Express, Inc.*,2:20cv00840, 2021 U.S. Dist. LEXIS 174240, 2021 WL 4173922 (D.Nev., Sept. 13, 2021); and *Parm et al. v. BMO Harris Bank, N.A., North American Banking Company, et al.*, 1:13cv03326 (N.D.Ga.).

115.  Further, NABC advertises itself as a bank which provides "personalized service to Third Party Senders and Money Services Businesses throughout the US." *See* https://www.nabankco.com/payments, accessed May 16, 2023.

116.   NABC states it also provides "solutions for higher risk industries" as well as a group of employees in its "dedicated Enhanced Risk Payments group." *Id.*

117.  Since NACHA mandates their ODFIs be informed of the details of names, addresses, and nature of the business which third-party billing services (like Viking) process payments for, NABC is aware the fact it is processing huge

amounts of ACH (as well as debit and credit card) transactions whose proceeds ultimately flow to the non-tribal beneficiaries of "tribal" payday lenders.

118.   NABC advertises it is a member of the Third-Party Payment Processors Association ("TPPPA") and the first bank ever to join.

119.   TPPPA seeks to promote fewer restrictions on third-party payment processing, including those relating to payday lending.

120.   Not coincidentally, TPPPA was founded in 2013, the same year Operation Choke Point was initiated.

121.   NABC is also aware of the extremely predatory nature of the loans made by West Side Lending since initial loan proceeds are wired out to a consumer, with many times that amount being wired out of the same consumer's checking account, or processed through Mastercard® or Visa® payment networks

122.   Mr. Sullivan has hired the aforementioned law firm to represent him in this matter and has assigned his right to fees and costs to such firm.

CLASS ACTION ALLEGATIONS

123.   Plaintiff brings this action on behalf of himself and all others similarly situated. All allegations herein are based on information and belief, except for those allegations that pertain to Plaintiff. Plaintiff's information and belief are based on, *inter alia*, the investigation conducted to date by Plaintiff and his counsel. Each

allegation in this consumer complaint either has evidentiary support or is likely to have evidentiary support after a reasonable opportunity for further investigation and discovery

**The RICO Class**

124.   Plaintiff adopts and incorporate paragraphs 1 – 123 as if fully restated herein.

125.   Pursuant to Fed. R. Civ. P. 23(b)(2), (b)(3) and/or (b)(4), Plaintiff brings this action for himself and on behalf of the following classes of which he is a member, initially defined as**:**

> **All consumers: (1) located in Virginia, Georgia, Maryland, Florida, Alabama, Arizona, Arkansas, California, Connecticut, Idaho, Illinois, Kansas, Minnesota, New York, Oregon, Rhode Island, South Dakota, Texas, West Virginia, or Wisconsin;[2] (2)**

---

[2] While Plaintiff is located in Arizona, Alabama, Arkansas, California, Connecticut, Idaho, Illinois, Kansas, Minnesota, New York, Oregon, Rhode Island, South Dakota, Texas, Virgina, West Virginia, and Wisconsin have similar laws that render the loans void as detailed with respect to Arizona. *See* Ala. Code § 5-18-4 (loans made without a license "shall be void"); Ark. Const. amend. LXXXIX, § 6 (loans that charge excessive interest rates are "void"); Cal. Fin. Code § 22750 (loans made without license are "void," including the "right to collect or receive any principal, charges, or recompense in connection with the transaction"); Conn. Gen. Stat. § 36a-558 (c)(1) (loans made without a license are "void" and uncollectable); Idaho Code § 28-46-402 (payday loans made without a license are "void, uncollectable and unenforceable"); 815 Ill. Comp. Stat. 122/4-10 (payday loans made without a license "shall be null and void"); Kan. Stat. § 16a-5-201 (loans that charge excessive interest and made without a license are "void"); Minn. Stat. §§ 47.60, 47.601 (provisions in loan contracts charging excessive interest rates are void and unenforceable); N.Y. Gen. Oblig. Law § 5-511 (usurious loans are "void"); Or. Rev. Stat. § 725.045 (consumer finance loans made without a license are "void"); Or. Rev. Stat. § 725.045 (consumer finance loans made without a license are "void"); 6 R.I. Gen. Laws § 6-26-4 (loans charging excessive interest "shall be usurious and void"); S.D. Codified Laws § 54-4-44 (loans charging excessive interest or made without a license are "void and uncollectible"); Tex. Fin. Code Ann. § 305.002 (allowing for recovery of the "principal amount on which interest is charged and received"); Va. Code § 6.2-1541(A) (declaring such loans "void" and principal uncollectible); W. Va. Code § 46A-5-101 (loans made in violation of Consumer Credit and Protection Act are "void and the consumer is not obligated to pay either the principal or the loan finance charge"); Wis. Stat. § 425.305 (declaring usurious transactions "void").

**who obtained a loan from West Side Lending, and (3) who made at least one payment towards the loan within the last four years (the "RICO Class").**

126.    Excluded from the RICO Class are the Defendants and any of their officers, directors, and employees.

127.    Plaintiff reserves the right to modify or amend the RICO Class definition before the Court determines whether certification is appropriate.

128.    **Numerosity. Fed R. Civ. P. 23(a)(1).** The Class members are so numerous that joinder of all of them is impractical. West Side Lending is heavily marketed throughout the United States and made a considerable number of loans to consumers throughout. Class members are therefore spread throughout the country. Although the precise number of Class members is unknown, on information and belief, there are at least 1,000 members, the names and addresses of whom are identifiable through documents and business records maintained by the Defendants.  The class members may be notified of the pendency of this action by published or mailed notice.

129.    **Existence and Predominance of Common Questions of Law and Fact. Fed. R. Civ. P. 23(a)(2).** There are questions of law and fact that are common to the RICO Class which predominate over questions affecting any individual class member. Specifically, these common questions include, without limitation: (a) whether the Defendants and associated persons constitute an *Enterprise* as defined

by 18 U.S.C. § 1961(4); (b) whether the activities of the Defendants or the enterprise affected interstate commerce; (c) whether loans made to members of the class by West Side Lending amount to unlawful debts as defined by 18 U.S.C. § 1961(6); (d) whether the Defendants participated in the enterprise through the collection of unlawful debt; (e) whether the Defendants conspired to collect unlawful debt; and, (f) whether Plaintiff and the class members were harmed by the Defendants.

130.  **Typicality. Fed. R. Civ. P. 23(a)(3).** Plaintiff's claims are typical of the claims of each Class member, which all arise from similar operative facts and are based upon the same legal theories. West Side Lending made numerous loans to consumers throughout the country, charging interest in excess of state interest rate caps and without any state lending licenses. Plaintiff has no interest adverse or antagonistic to the interests of other members of the Class and has the same claims for statutory damages that he seeks for members of the Class.

131.  **Adequacy of Class Representation. Fed. R. Civ. P. 23(a)(4).** Plaintiff is an adequate representative of the RICO Class and will fairly and properly protect the interests of the Class. Plaintiff has retained experienced counsel who have litigated well over one thousand consumer cases under consumer protection statutes, including RICO. Plaintiff's counsel are competent in the prosecution of class action litigation and intend to prosecute this action vigorously.

Plaintiff and his counsel will fairly and adequately protect the interests of members of the Class.

132. **Predominance and Superiority. Fed. R. Civ. P. 23(b)(3).** Questions of law and fact common to the Class members predominate over questions affecting only individual Class members. Under the totality of the circumstances, a Class Action is superior to other available methods for the fair and efficient adjudication of the controversy. The Defendants' conduct described in this Complaint stems from common and uniform practices, resulting in systematic violations of RICO. It would be virtually impossible for members of the class individually to effectively redress the wrongs done to them. Even if the members of the class themselves could afford such individual litigation, it would be an unnecessary burden on the Courts. Furthermore, individualized litigation presents a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and to the court system presented by the legal and factual issues raised by the Defendants' conduct.

133. **Injunctive Relief Appropriate for the Defendants, Class. Fed. R. Civ. P. 23(b)(2).** Class certification is appropriate because Defendants have and continue to act on grounds generally applicable to the class, making appropriate injunctive relief with respect to Mr. Sullivan and the class members. Mr. Sullivan and the putative class seek an injunction prohibiting the Defendants from continued

collection of these illegal loans and ordering the dissolution of each corporate Defendant that has engaged in any enterprise pled herein.

**The Wage Assignment Sub-Class**

134.   Plaintiff adopts and incorporate paragraphs 1 – 123 as if fully restated herein.

135.   Included within the RICO Class are a sub-class of persons initially defined as follows:

**All consumers: (1) located in the United States; (2) whose employer, within one year of the date of the filing of this complaint, received a "Wage Assignment Demand Notice" or similar notification, from Valley Servicing, regarding a loan issued by West Side Lending (the "Wage Assignment Sub-Class").**

136.   Pursuant to Fed. R. Civ. P. 23(b)(2), (b)(3) and/or (b)(4), Plaintiff brings this action for himself and on behalf of the Wage Assignment Sub-Class of which he is a member.

137.   Excluded from the Wage Assignment Sub-Class are the Defendants and any of their officers, directors, and employees.

138.   Plaintiff reserves the right to modify or amend the Wage Assignment Sub-Class definition before the Court determines whether certification is appropriate.

139.   **Numerosity. Fed. R. Civ. P. 23(a)(1).** The Class members are so numerous that joinder of all of them is impractical. West Side Lending was heavily marketed throughout the United States and made a considerable number of loans to consumers located throughout.[3] Class members are therefore spread throughout the United States. Although the precise number of Class members is unknown, on information and belief, there are at least 1,000 members, the names and addresses of whom are identifiable through documents and business records maintained by the Defendants. The class members may be notified of the pendency of this action by published or mailed notice.

140.   **Existence and Predominance of Common Questions of Law and Fact. Fed. R. Civ. P. 23(a)(2).** There are questions of law and fact that are common to the Wage Assignment Sub-Class which predominate over questions affecting any individual class member. Specifically, these common questions include, without limitation: (a) whether Red Cypress Group is a *Debt Collector* as defined by the FDCPA; (b) whether the Class members' alleged debts constitute *Consumer Debts*; (c) whether Red Cypress Group violated §§ 1692e and 1692f of the FDCPA by attempting to collect debts which were unenforceable and by sending a "Wage

---

[3] West Side Lending's website indicated that consumers located in Arkansas, Connecticut, District of Columbia, Florida, Georgia, Illinois, Maine, Maryland, Massachusetts, Minnesota, New Jersey, New York, North Carolina, Pennsylvania, South Carolina, Vermont, Virginia, West Virginia, Wisconsin were ineligible for loans.

Assignment Demand Notice" to the Class members' employers; and, (d) whether Plaintiff and the class members were harmed by the Red Cypress Group.

141. **Typicality. Fed. R. Civ. P. 23(a)(3).** Plaintiff's claims are typical of the claims of each Class member, which all arise from similar operative facts and are based upon the same legal theories. West Side Lending made numerous loans to consumers throughout the country. These loans were then assigned to Red Cypress Group or Valley Servicing – in an attempt to unlawfully garnish the wages of these same consumers, via wage assignment notices sent directly to their employers, without first obtaining a judgment. Plaintiff has no interest adverse or antagonistic to the interests of other members of the Class and has the same claims for statutory damages that he seeks for members of the Class.

142. **Adequacy of Class Representation. Fed. R. Civ. P. 23(a)(4).** Plaintiff is an adequate representative of the Wage Assignment Sub-Class and will fairly and properly protect the interests of the Class. Plaintiff has retained experienced counsel who have litigated well over one thousand consumer cases under consumer protection statutes, including the FDCPA. Plaintiff's counsel are competent in the prosecution of class action litigation and intend to prosecute this action vigorously. Plaintiff and his counsel will fairly and adequately protect the interests of members of the Class.

143.   **Predominance and Superiority. Fed. R. Civ. P. 23(b)(3).** Questions of law and fact common to the Class members predominate over questions affecting only individual Class members. Under the totality of the circumstances, a Class Action is superior to other available methods for the fair and efficient adjudication of the controversy. The Defendants' conduct described in this Complaint stems from common and uniform practices, resulting in systematic violations of the FDCPA. It would be virtually impossible for members of the class individually to effectively redress the wrongs done to them. Even if the members of the class themselves could afford such individual litigation, it would be an unnecessary burden on the Courts. Furthermore, individualized litigation presents a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and to the court system presented by the legal and factual issues raised by the Defendants' conduct.

144.   **Injunctive Relief Appropriate for the Defendants, Class. Fed. R. Civ. P. 23(b)(2).** Class certification is appropriate because Defendants have and continue to act on grounds generally applicable to the class, making appropriate injunctive relief with respect to Mr. Sullivan and the class members. Mr. Sullivan and the putative class seek an injunction prohibiting the Defendants from continued collection of these illegal loans and ordering the dissolution of each corporate Defendant that has engaged in any enterprise pled herein.

**COUNT I**

**VIOLATIONS OF THE FDCPA, 15 U.S.C. § 1692e**

**(Class Claim on behalf of the RICO Class against Red Cypress Group)**

145.   Plaintiff adopts and incorporate paragraphs 1 – 123 as if fully restated herein.

146.   The loans issued by West Side Lending to Mr. Sullivan and the Class each charged an interest rate far in excess of the permissible rate under Arizona law and, thus, the loans are unenforceable.

147.   The loans issued by West Side Lending to Mr. Sullivan and the Class were issued without the requisite state license, and are thus void and unenforceable.

148.   Red Cypress Group violated § 1692e of the FDCPA when Valley Servicing used false and deceptive representations in connection with the collection of a debt, by indicating to Mr. Sullivan and the Class that they owed amounts that they did not owe, deceptively labeling the debts as though they were legal, valid, and enforceable when they were not, and by falsely representing they could collect such loans through a "Wage Assignment Demand Notice."

149.   Class members suffered actual damages in the form of money withheld from their paychecks and sent to Red Cypress Group and/or West Side Lending, damage to their reputations, and severe emotional distress as a result of Red Cypress Group's violations of § 1692e.

150.   Accordingly, Red Cypress Group is liable to Mr. Sullivan and each putative Class member for their actual damages, statutory damages of up to $1,000.00, costs, and attorney's fees pursuant to 15 U.S.C. § 1692k.

**COUNT II**
**VIOLATIONS OF THE FDCPA, 15 U.S.C. § 1692f**

**(Class Claim on behalf of the RICO Class against Red Cypress Group)**

151.   Plaintiff adopts and incorporate paragraphs 1 – 123 as if fully restated herein.

152.   The loans issued by West Side Lending to Mr. Sullivan and the Class each charged an interest rate far in excess of the permissible rate under Arizona law and, thus, the loans are unenforceable.

153.   The loans issued by West Side Lending to Mr. Sullivan and the Class were issued without the requisite state license, and are thus void and unenforceable.

154.   Red Cypress Group violated § 1692f of the FDCPA when Valley Servicing attempted to collect amounts which were not permitted by law. Specifically, Red Cypress Group attempted to collect loans issued by West Side Lending which were unenforceable and illegal due to the application of interest rates well in excess of applicable state law.

155.   Class members suffered actual damages in the form of money withheld from their paycheck and sent to Red Cypress Group and/or West Side

Lending, damage to their reputation, and severe emotional distress as a result of Red Cypress Group's violations of § 1692f.

156.   Accordingly, Red Cypress Group is liable to Mr. Sullivan and each putative Class member for their actual damages, statutory damages of up to $1,000.00, costs, and attorney's fees pursuant to 15 U.S.C. § 1692k.

**COUNT III**
**VIOLATIONS OF THE FDCPA - 15 U.S.C. § 1692c(b)**

**(Class Claim on behalf of the Wage Assignment Sub-Class against Red Cypress Group)**

157.   Plaintiff adopts and incorporate paragraphs 1 – 123 as if fully restated herein.

158.   Red Cypress Group violated § 1692c(b) of the FDCPA when Valley Servicing, acting on behalf of West Side Lending, communicated with Mr. Sullivan's, and each Class member's, employer, through use of a "Wage Assignment Demand Notice," in connection with the collection of a debt, without consent and without first obtaining a judgment.

159.   Class members suffered actual damages in the form of money withheld from their paycheck and sent to Red Cypress Group and/or West Side Lending, damage to their reputation, and severe emotional distress as a result of Red Cypress Group's violations of § 1692c.

160.   Accordingly, Red Cypress Group is liable to Mr. Sullivan and each putative Class member for their actual damages, statutory damages of up to $1,000.00, costs, and attorney's fees pursuant to 15 U.S.C. § 1692k.

**COUNT IV**
**VIOLATIONS OF RICO, 18 U.S.C. § 1962(c)**

**(Class Claim on behalf of the RICO Class against all Defendants)**

161.   Plaintiff adopts and incorporate paragraphs 1 – 123 as if fully restated herein.

162.   The Defendants, through their participation in the furtherance of the West Side Lending scheme, along with the Menominee Tribe and the WLCC, and other persons, natural and otherwise, constitute an *Enterprise* as defined by 18 U.S.C. § 1961(4).

163.   The loans issued by West Side Lending to Mr. Sullivan and the Class carried an interest rate far in excess of the permissible rate under Arizona law and, thus, the loans are unenforceable and constitute *Unlawful Debts* under RICO, 18 U.S.C. § 1961(6).

164.   The Defendants each associated with the enterprise and participated in the affairs of the enterprise as described in detail herein, which existed for the purpose of collection of unlawful debt.

165.   The Defendants' participation in the enterprise violated § 1962(c) of RICO and caused Mr. Sullivan and the Class to repay amounts on unlawful loans.

166.   The Class has suffered economic damages in the form of amounts withheld from their paycheck and sent to Defendants in response to the "Wage Assignment Demand Notices."

167.   Accordingly, the Defendants are jointly and severally liable to Mr. Sullivan and the putative class members for treble damages, costs, and attorney's fees pursuant to 18 U.S.C. § 1964(c).

**COUNT V**
**VIOLATIONS OF RICO, 18 U.S.C. § 1962(d)**

**(Class Claim on behalf of the RICO Class against all Defendants)**

168.   Plaintiff adopts and incorporate paragraphs 1 – 123 as if fully restated herein.

169.   The Defendants, through their participation in the furtherance of the West Side Lending scheme, along with the Menominee Tribe and the WLCC, and other persons, natural and otherwise, constitute an *Enterprise* as defined by 18 U.S.C. § 1961(4).

170.   The loans issued by West Side Lending to Mr. Sullivan and the Class carried an interest rate far in excess of the permissible rate under Arizona law and,

thus, the loans are unenforceable and constitute *Unlawful Debts* under RICO, 18 U.S.C. § 1961(6).

171.   The Defendants violated § 1962(d) of RICO by conspiring with each other, and other persons, including the Menominee Tribe and the WLCC, to issue and collect unlawful debts issued by West Side Lending through use of "Wage Assignment Demand Notices."

172.   The Defendants agreed to participate in the RICO conspiracy and agreed to the overall objective of the conspiracy – to collect unlawful loans through use of "Wage Assignment Demand Notices" – as evidenced by their issuance of a "Wage Assignment Demand Notice" to Mr. Sullivan's and the putative class members' employers.

173.   The Defendants were each aware of the goals of the enterprise and each took actions in furtherance of this conspiracy. For example, at various times:

     a.  West Side Lending issued loans to Mr. Sullivan and the Class;

     b.  Wolf River and New Platform facilitated the operation of the West Side Lending platform;

     c.  NABC and Viking provided access to the ACH network and initiated ACH deposits and withdrawals to and from bank accounts for Mr. Sullivan and the Class; and,

     d. Red Cypress Group sent "Wage Assignment Demand Notices" to the employers of Mr. Sullivan and the Class in attempts to collect unlawful debt.

174. The Class has suffered economic damages in the form of amounts withheld from their paycheck and sent to Defendants in response to the "Wage Assignment Demand Notices."

175. Accordingly, the Defendants are jointly and severally liable to Mr. Sullivan and the putative class members for treble damages, costs, and attorney's fees pursuant to 18 U.S.C. § 1964(c).

**COUNT VI**
    **UNJUST ENRICHMENT**

**(Class Claim on behalf of the RICO Class against all Defendants)**

176. Plaintiff adopts and incorporate paragraphs 1 – 123 as if fully restated herein.

177. The loans issued by West Side Lending to Plaintiff and the Class each charged an interest rate which rendered the loan void and unenforceable due to applicable state laws, and were each issued without the requisite state license.

178. Plaintiff and the Class conferred a benefit on Defendants when they repaid their loans, as they had no obligation to do so and, therefore, Defendants were owed nothing.

179.   Defendants knew or should have known of the benefit; and Defendants have been unjustly enriched through their receipt of any amounts in connection with the unlawful loans such that it would be inequitable for Defendants to retain the money they received.

180.   Accordingly, on behalf of themselves and all other consumers similarly situated, Plaintiff seeks to recover from Defendants, jointly and severally, all amounts repaid on the West Side Lending loans.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff requests that the Court enter judgment on behalf of herself and the classes she seeks to represent against Defendants for:

    a.    Certification for this matter to proceed as a class action;

    b.    An award of actual, treble, punitive, and statutory damages as pled herein;

    c.    Injunctive relief as pled herein;

    d.    An award of pre-judgment and post-judgment interest as provided by law;

    e.    An award of attorneys' fees, litigation expenses, and costs of suit;

    f.    Such other relief as the Court deems just and proper.

**<u>DEMAND FOR JURY TRIAL</u>**

Mr. Sullivan hereby demands a jury trial on all issues so triable.

**KAZEROUNI LAW GROUP, APC**

Dated: December 28, 2023

By:   /s/ Ryan L. McBride
Ryan L. McBride, Esq.
Attorney for Plaintiff